Nos. 2013-1527, 2014-1121, -1526, -1528

───────────────────────────────

**United States Court of Appeals
For The Federal Circuit**

───────────────────────────────

**WESTERNGECO L.L.C.,**

*Plaintiff-Cross-Appellant*,

v.

**ION GEOPHYSICAL CORPORATION,**

*Defendant-Appellant*.

───────────────────────────────

**Appeals from the United States District Court for the Southern District of
Texas in case no. 09-cv-1827, Judge Keith P. Ellison.**

───────────────────────────────

**CORRECTED NON-CONFIDENTIAL BRIEF FOR DEFENDANT-
APPELLANT ION GEOPHYSICAL CORPORATION**

| **David J. Healey** | **Justin M. Barnes** | **Frank Porcelli** |
|---|---|---|
| **Fish & Richardson P.C.** | **Fish & Richardson P.C.** | **Fish & Richardson P.C.** |
| **One Houston Center** | **12390 El Camino Real** | **One Marina Park Drive** |
| **1221 McKinney Street,** | **San Diego, CA 92130** | **Boston, MA 02210** |
| **Suite 2800** | **Tel: 858-678-5070** | **Tel: 617-542-5070** |
| **Houston, TX 77010** | | |
| **Tel: 713-654-5300** | | |

Attorneys for Defendant-Appellant

## <u>CERTIFICATE OF INTEREST</u>

Counsel for the Defendant-Appellant certifies the following:

1.      The full name of every party represented by counsel is:

ION Geophysical Corporation

2.      The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by counsel is:

N/A

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

N/A

4.      The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this Court are:

Fish & Richardson P.C.: David J. Healey, Justin M. Barnes, Frank Porcelli, Brian G. Strand, Francis J. Albert, Olga May, Kevin Su, Robert Courtney, Bailey Harris, Jackob Ben-Ezra;

Porter Hedges L.L.P.: Ray Torgerson, Jonathan Pierce, Jonna Summers, Eric Wade, Susan Hellinger

Jones Day: David Burgert

i

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST ................................................... i
RELATED CASES ................................................................. 1
JURISDICTIONAL STATEMENT ........................................... 1
ISSUES PRESENTED ............................................................ 2
STATEMENT OF THE CASE ................................................. 3
STATEMENT OF FACTS ....................................................... 6
    A.    The Underlying Technology ...................................... 6
    B.    The Bittleston Patents' Chain of Title ........................ 8
    C.    WG Focused on Extraterritorial Activities for Liability and
         Damages ............................................................. 13
    D.    Pertinent District Court Rulings ................................ 14
    E.    Post-Verdict Changes in the Law .............................. 19
SUMMARY OF ARGUMENT ............................................... 21
ARGUMENT ...................................................................... 24
I.    WG Lacks Standing for the Bittleston Patents ................... 24
    A.    ION Has Not Waived and Is Not Estopped from Challenging
         Standing, Particularly in Light of WG's Misstatements ............. 27
    B.    There Is No Assignment from the Inventors to WG in the
         Chain of Title ...................................................... 31
    C.    The Corporate Agreements Pre-Dating the Inventors'
         Assignments Cannot Convey Legal Title to WG ............ 34
II.    The District Court's Improper 271(f) Rulings Require a New Trial ...... 35
    A.    The Court Applied the Wrong Intent for 271(f)(1) ...................... 37
    B.    The Error Prejudiced ION at Trial .............................. 40
    C.    The Court's Error Regarding 271(f)(1) Necessarily Infected
         271(f)(2) .......................................................... 41
    D.    Plain Error Based on the Subsequent *Commil* Decision
         Requires a New Trial ............................................. 45
III.    Lost Profits are Unavailable as a Matter of Law ................... 47
    A.    The District Court Failed to Consider the Post-Verdict *Power
         Integrations* Decision Banning Extraterritorial Lost Profits ........ 48

     B.     This Court and the Supreme Court Have Recognized That
           Damages Cannot Be Tied to Purely Extraterritorial Acts ........... 50

     C.     *Panduit* Cannot be Satisfied Because ION and WG do not
           Compete in the Marketplace, Here or Abroad ............................ 56

CONCLUSION ............................................................................. 59


ADDENDUM

Memorandum and Order on Post-Trial Motions, dated
June 19, 2013 ................................................................. A000001-48

Memorandum and Order on Plaintiff's Motion for Summary
Judgment of Willful Infringement, dated June 29, 2012 .................. A000049-58

Memorandum and Order on Defendants' Motions to Exclude Expert
Testimony of Raymond Sims and Certain Motions in Limine,
dated July 16, 2012 ........................................................... A000059-70

Jury Verdict Form, dated August 16, 2012 ....................................... A000071-78

Memorandum and Order on WesternGeco's Motion for Supplemental
Damages, Motion to Strike, and ION's Motion to Compel, dated
October 24, 2013 (filed under seal) .................................................. A000079-92

Order on Defendant's Motion for Remittitur, dated April 30, 2014
(filed under seal) ................................................................. A000093-96

Final Judgment, dated May 7, 2014 ................................................ A000097-98

U.S. Patent No. 6,691,038 .............................................................. A000478-92

U.S. Patent No. 7,080,607 .............................................................. A000503-14

U.S. Patent No. 7,162,967 .............................................................. A000515-25

U.S. Patent No. 7,293,520 .............................................................. A000526-36

Assignment of Control System for Positioning of Marine Seismic Streamers from Oyvind Hillesund to Schlumberger Technology Corporation, dated February 26, 2001 ..................................................................... A012195-96

Assignment of Control System for Positioning of Marine Seismic Streamers from Simon Bittleston to Schlumberger Technology Corporation, dated February 26, 2001 ............................................... A012197-98

Assignment Record of U.S. Patent 6,932,017 from the United States Patent and Trademark Office website.......................................................A012199

## CONFIDENTIAL MATERIAL OMITTED

The material omitted on pages 12, 34 and 35 reflect terms of a confidential agreement.

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Advanced Display Sys., Inc. v. Kent State Univ.*,
212 F.3d 1272 (Fed. Cir. 2000) ..........................................................37

*Agro Dutch Industries Ltd. v. United States*,
508 F.3d 1024 (Fed. Cir. 2007) ..........................................................38

*Bd. of Trs. of the Leland Stanford Junior Univ. v. Roche Molecular
Sys., Inc.*,
131 S. Ct. 2188 (2011).......................................................................31

*Bd. of Trs. of the Leland Stanford Junior Univ. v. Roche Molecular
Sys., Inc.*,
583 F.3d 832 (Fed. Cir. 2009) ..........................................................31

*BIC Leisure Prods., Inc. v. Windsurfing Int'l, Inc.*,
1 F.3d 1214 (Fed. Cir. 1993) .............................................................57

*Boeing Co. v. Comm'r of Patents and Trademarks*,
853 F.2d 878, (Fed. Cir. 1988) ..........................................................27

*Brown v. Duchesne*,
60 U.S. 183 (1856)..............................................................................51

*Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc.*,
576 F. 3d 1348 (Fed. Cir. 2009) (*en banc*) .................................*passim*

*Commil USA, LLC v. Cisco Sys., Inc.*,
720 F.3d 1361 (Fed. Cir. 2013) .................................................*passim*

*Commil USA, LLC v. Cisco Systems, Inc.*,
737 F.3d 699 (Fed. Cir. 2013) ..........................................................45

*Crawford v. Falcon Drilling Co., Inc.*,
131 F.3d 1120 (5th Cir. 1997) ..........................................................46

v

*Crystal Semiconductor Corp. v. TriTech Microelectronics Intern.,*
  *Inc.,*
  246 F.3d 1336 (Fed. Cir. 2001) .......................................................57

*CytoLogix Corp. v. Ventana Med. Sys., Inc.,*
  424 F.3d 1168 (Fed. Cir. 2005) .......................................................37

*Deepsouth Packing Co. v. Laitram Corp.,*
  406 U.S. 518 (1972).....................................................39, 49, 52, 54

*Gasoline Products Co. v. Champlin Refining Co.,*
  283 U.S. 494 (1931).................................................................42, 44

*Gellman v. Telular Corp.,*
  449 F. App'x 941 (Fed. Cir. 2011) .....................................25, 27, 31

*Global-Tech Appliances, Inc. v. SEB S.A.,*
  —— U.S. ——, 131 S.Ct. 2060 (2011)..............................6, 20, 22, 35

*Harper v. Virginia Dep't of Taxation,*
  509 U.S. 86, 113 S.Ct. 2510 (1993)..................................................45

*Jimenez v. Wood Cnty., Tex.,*
  621 F.3d 372 (5th Cir. 2010) ...........................................................37

*Johns Hopkins Univ. v. CellPro, Inc.,*
  152 F.3d 1342 (Fed. Cir. 1998) .......................................................50

*Johnson v. U.S.,*
  520 U.S. 461 (1997)........................................................................45

*Jowers v. Lincoln Elec. Co.,*
  617 F.3d 346 (5th Cir. 2010) ...........................................................36

*Kaempe v. Myers,*
  367 F.3d 958 (D.C. Cir. 2004).........................................................26

*LG v. Quanta,*
  128 S. Ct. 2109 (2008)....................................................................52

*Limelight Networks v. Akamai Technologies,*
  134 S. Ct. 2111 (2014)....................................................................37

*Liquid Dynamics Corp. v. Vaughan Co.*,
449. F.3d 1209, 1222-23 (Fed. Cir. 2006) ............................................................37

*Lucent Techs. v. Gateway, Inc.*,
543 F.3d 710 (Fed. Cir. 2008) .......................................................................1, 27

*MeadWestVaco Corp. v. Rexam Beauty and Closures, Inc.*,
731 F.3d 1258 (Fed. Cir. 2013) ..........................................................................36

*Microsoft Corp. v. AT&T Corp.*,
550 U.S. 437 (2007) .........................................................................48, 49, 51, 55

*Mitutoyo Corp. v. Cent. Purchasing, LLC*,
No. 03 C 0990, 2006 WL 644482 (N.D. Ill. Mar. 9, 2006) ..............................57

*Mitutoyo Corp. v. Cent. Purchasing, LLC*,
499 F.3d 1284 (Fed. Cir. 2007) ....................................................................57, 58

*Morrow v. Microsoft Corp.*,
499 F.3d 1332 (Fed. Cir. 2007) ........................................................6, 25, 51, 53

*Owen Equip. & Erec. Co. v. Kroger*,
437 U.S. 365 (1978) .....................................................................................28, 30

*Pandrol USA LP v. Airboss Ry. Prods.*,
320 F.3d 1354 (Fed. Cir. 2003) ....................................................................29, 30

*Paradise Creations, Inc. v. UV Sales, Inc.*,
315 F.3d 1304 (Fed. Cir. 2003) ..........................................................................25

*Regional Props., Inc. v. Financial & Real Estate Consulting Co.*,
752 F.2d 178 (5th Cir. 1985) ..............................................................................30

*Rite-Hite v. Kelley*,
56 F.3d 1538 (Fed. Cir. 1995) ............................................................................52

*Robert Bosch, LLC v. Pylon Mfg. Corp.*,
719 F.3d 1305 (Fed. Cir. June 14, 2013) ...........................................................21

*In re Sealed Appellant*,
194 F.3d 666 (5th Cir. 1999) ..............................................................................36

*SiRF Technology, Inc. v. International Trade Com'n,*
   601 F. 3d 1319 (Fed. Cir. 2010) ........................................................25

*Speedplay, Inc. v. Bebop, Inc.,*
   211 F3d 1245 (Fed. Cir. 2000) ..........................................................31

*Spine Solutions, Inc. v. MedTronic Sofamor Danek USA, Inc.,*
   620 F.3d 1305 (Fed. Cir. 2010) .........................................................30

*Swift & Co. v. Hocking Valley R. Co.,*
   243 US 281 (1917)................................................................28, 29, 30

*T.D. Williamson, Inc. v. Laymon,*
   723 F. Supp. 587 (N.D. Okla. 1989)...............................................53, 54

*T.D. Williamson, Inc. v. Laymon,*
   923 F.2d 871 (Fed. Cir. 1990) (unpublished) ....................................53

*Tyco Healthcare Grp. LP v. Ethicon Endo-Surgery, Inc.,*
   587 F.3d 1375 (Fed. Cir. 2009) .....................................................24, 27

*U.S. Philips Corp. v. Iwasaki Elec. Co.,*
   505 F.3d 1371 (Fed. Cir. 2007) .....................................................25, 27

*U.S. v. Williamson,*
   183 F.3d 458 (5th Cir. 1999) .........................................45, 53, 54, 55

*Vidrine v. Kansas City S. Ry. Co.,*
   466 F.2d 1217 (5th Cir. 1972) ........................................................42

*Wechsler v. Macke Int'l Trade, Inc.,*
   486 F.3d 1286 (Fed. Cir. 2007) .................................................47, 48, 57

*Whitehead v. Food Max of Mississippi, Inc.,*
   163 F.3d 265 (5th Cir. 1998) ...........................................................44

**Rules / Statutes**

28 U.S.C. §1295(a) (1)....................................................................1

35 U.S.C. § 261 .....................................................25, 30, 31, 35

35 U.S.C. § 271(f)...............................................................3, 51, 54

37 C.F.R. § 3.54 ...................................................................................................26

37 C.F.R. § 3.73(b) ...................................................................................11, 12, 26

37 C.F.R. § 3.73(b)(i)-(ii) ...................................................................................26

MPEP 324.X ...................................................................................................26

Federal Rule of Evidence 1002...............................................................................32

Federal Rule of Evidence 1003...............................................................................32

Federal Rule of Evidence 1007...............................................................................33

## RELATED CASES

ION is not aware of any cases related to the present appeal.

## JURISDICTIONAL STATEMENT

ION denies the district court had subject matter jurisdiction, and that this Court has subject matter jurisdiction, regarding U.S. Patent Nos. 7,080,607, 7,162,967 and 7,293,520 (collectively "the Bittleston patents"). WesternGeco ("WG") lacks Article III standing to sue on the Bittleston patents since it has never had legal title to them.

ION's motion for partial dismissal of the appeal for lack of standing on the Bittleston patents was filed on July 1, 2014 (D41). This Court "deem[ed] it the better course to deny the motion and for ION to raise their jurisdictional arguments in their brief." D53.

ION timely filed a notice of appeal from the May 7, 2014 Final Judgment. ION also filed notice of appeals for two prior Orders (June 19, 2013 and October 23, 2013). All three notices of appeal were consolidated into this appeal. This Court has appellate jurisdiction over the appeal under 28 U.S.C. §1295(a) (1). *Compare Lucent Techs. v. Gateway, Inc.*, 543 F.3d 710, 717 (Fed. Cir. 2008) (finding jurisdiction for appeal proper, then holding plaintiff lacked standing).

1

## ISSUES PRESENTED

1) Where the only written assignments in the record are from the inventors to a third party, and plaintiff misstated that it was the assignee when filing these documents at the PTO, did the district court err in finding standing based largely on presuming title from the patent publication, and drawing an adverse inference against defendant based on when it raised subject matter jurisdiction?

2) Did the district court err in holding § 271(f)(1) liability requires only intent that components be combined abroad, rather than intent to circumvent the patent or induce what would be infringement if in the U.S., and accordingly finding defendant liable on summary judgment?

   a. Did the court's refusal to provide clear jury instructions limiting the summary judgment ruling, and refusal to forbid plaintiff's repeated references to defendant as an adjudicated infringer, hopelessly infect other liability issues, warranting a new trial?

   b. Is defendant entitled to a new trial on §§ 271(f)(1) and (f)(2) under *Commil* where it had a good faith belief the patents were invalid, and the court held those arguments were objectively reasonable?

3) Did the district court err in allowing lost profits as a matter of law where plaintiff's purported lost sales were for services abroad, where plaintiff

and defendant did not compete in the same markets either inside or outside the U.S., and the purported lost profits were based on foreign parties' systems built and used overseas, which included defendant's components?

## STATEMENT OF THE CASE

ION manufactures components for use in the marine geophysical survey industry. WG, (purported) patentee and appellee, alleged that ION violated 35 U.S.C. § 271(f) by supplying from the United States ION's DigiFIN product and Lateral Controller software, which ION's foreign customers incorporate into complex systems to perform marine geophysical surveys for oil and gas exploration. WG alleged a reasonable royalty on the DigiFIN component and Lateral Controller software, as well as lost profits on 10 alleged "lost bids" to foreign customers for services outside the United States.

This appeal primarily relates to the district court's improper extension of extraterritorial liability for infringement and lost profits. But only primarily. Before reaching those issues, there is the threshold issue of subject matter jurisdiction for the Bittleston patents. WG does not have, and never has had, legal title to these patents. Instead, the assignment of record in the PTO is to a different entity, Schlumberger Technology Corporation ("STC"). There are no written assignments to anyone other than STC. This issue was not raised until after

verdict, but with good reason – WG's misstatements at the PTO caused the patents to issue with WG (incorrectly) listed as the assignee.

The district court adopted, with no cited authority, a "presumption" that WG was the assignee based on the patents as originally published – even though this is contrary to Federal Circuit precedent. Further, despite WG's actions that obscured legal title, the district court drew an inference against ION based on timing. The district court's analysis was erroneous because (1) it improperly shifted the burden on standing to ION, (2) timing is irrelevant for standing, and (3) WG's misstatements to the PTO masked the problem. WG could never do what the law requires – establish a chain of title from the inventors based on effective written assignments. On any standard of review, especially *de novo*, the standing ruling must be reversed.

Regarding infringement, the district court improperly applied 271(f) to expand the patents' extraterritorial effect beyond that permitted by statute. First, the court wrongfully held 271(f)(1) did not require intent analogous to 271(b), *e.g.*, deliberately circumventing the patentee's rights by purposefully inducing abroad a combination known to be infringing. Based on this faulty interpretation, the court granted summary judgment that ION infringed '520 patent claim 18 under 271(f)(1), while simultaneously denying summary judgment under (f)(2) on the same claim because WG had not shown that ION intended to cause infringement.

4

This ruling infected the trial, the jury instructions, and eventually the verdict. Over ION's objections, WG continually labeled ION as an infringer throughout trial. WG argued the case was not about infringement, because ION had already been found to infringe; rather the case was really about damages. Yet under any circumstance, and certainly in view of *Commil*, liability was not established since validity remained disputed. ION requested clarifying jury instructions to partially offset this severe prejudice, but the Court refused. Ultimately, the jury's verdict was driven by the powerful impression resulting from the court's incorrect rulings that ION was 'guilty as charged.' The summary judgment ruling must be reversed, and a new trial is required on liability for all claims on all issues.[1]

Worse yet, the district court allowed WG to pursue lost profits based solely on competition abroad for services between WG's ships overseas and ION's foreign customers. Since all acts involved in the "loss" from these competing bids and performance of services were outside the United States, the lost profits awarded were for purely foreign activities of others. Similarly, the district court's explicit instructions for lost profits required that the parties compete in the same

---

[1] Additionally, *Commil* warrants a new trial under the plain error standard, based on new precedent. The October 2013 dissent from *en banc* in late October 2013 first gave notice that many judges on this Court considered it to be a change in the law, but this was long after this case's post-trial motions, after ION's first notice of appeal had been docketed, and even after the district court's October 23, 2013 initial opinion on supplemental damages and final wording of the injunction.

market (overseas or not), but it was uncontested that ION sold only components to survey companies and WG sold only services to oil and gas exploration companies.

*Global-Tech* should have alerted the district court that its mental state standard for 271(f)(1) was unduly expansive. *Power Integrations* should have confirmed that the lost profits analysis was fatally flawed. *Microsoft* and *Cardiac Pacemakers* should have made clear the policy against extraterritorial expansion of U.S. patent law. But the district court refused to disturb the verdict, pushing forward post-trial in spite of the law.

## STATEMENT OF FACTS

### A.    The Underlying Technology

Marine geophysical surveys attempt to locate and characterize pockets of oil or gas beneath the ocean floor. To perform a survey, a seismic vessel is outfitted with an array of "streamers," computers, software, and other equipment. A001186-87, A002477-78. A streamer is made up of a series of neutrally buoyant cables connected end to end, sometimes miles in length. A001182, A001348. Each streamer has seismic data collection equipment, such as "hydrophones" (specialized microphones for detecting underwater sounds) and devices that affect the streamer's vertical and lateral movement. A000508 at 1:20-28 and 1:34-49, A001505-08. A device at the ship creates seismic waves that permeate the ocean floor so that other seismic equipment (*e.g.,* hydrophones) collect data about oil and

6

gas deposits.  Sophisticated algorithms and hardware analyze this data to generate the survey results.  A000508 at 1:28-33, A001188-89, A001249-51.  Companies that operate these seismic survey vessels compete for business from oil and gas exploration companies.

The types of services at issue are known as "2D," "3D" and "4D" surveys. A 2D survey employs a single towed streamer, and produces an image of a narrow "slice" of the subsurface below.  In a 3D survey, an array of multiple streamers is towed in parallel.  A 4D survey is similar in concept to time-lapse photography: a prior 3D survey is repeated over the same area multiple times to measure changes in the migration of oil or gas.  A001189-91.

A survey and the resulting data's accuracy can be affected by environmental conditions such as waves or obstacles, which can skew the streamer array, cause streamers to become tangled with each other, or cause interference "artifacts." A000508 at 1:42-45, 2:5-8.  Over time, techniques were developed to control streamer motion and offset or avoid tangling and artifacts; one example is the depth at which streamers are towed.  Depth is changed and maintained by a series of devices along each streamer known as "birds."  A000508 at 1:42-57.  One leading example is ION's unaccused DigiBIRD, which ION has sold to many survey companies, including WG, for decades.  A004186-87, A001343-44, A001891, A002378, A003944.  Each "bird" typically has a depth sensor and a

7

horizontal wing.  Changes in the "wing" angle of the birds are coordinated by an

onboard computer, which adjusts the birds upward or downward to adjust streamer

depth as the streamer is pulled through the water.  A000508 at 1:49-57.  In the

same way, a streamer can be moved laterally (horizontally) by devices with

vertically-oriented wings (also called a "fin") such as ION's accused DigiFIN.

A000508 at 1:58-63, A001193-94.

   Some birds have dual wings that control both vertical and lateral motion,

like WG's Q-Fin that WG uses to conduct its own surveys.  A001330-32.

According to the Bittleston patents' specification, automatic systems to control

streamers' lateral or horizontal positions were well known in the art (including Dr.

Bittleston's PCT application for a dual-axis bird, which is 102(b) art for the

patents-in-suit), and thus the inventions were directed to particular ways of

controlling the streamer arrays' position.  A000508 at 1:58-2:57.[2]

### B.    The Bittleston Patents' Chain of Title

The three Bittleston patents focus on the control system that changes or

maintains the positions of the streamers.  The patents share common inventors and

---

[2] For the fourth patent-in-suit, U.S. Patent No. 6,691,038 to Zajac, WG asserted claim 14, which is to a system comprising a towing vessel, an array of streamers, at least one attached "active streamer positioning device" ("ASPD"), a "master controller" that makes use of "tracking systems" and an "environmental sensor" to determine corrective positioning commands to be issued to one or more ASPD to maintain a specified geometry of the streamer array.  A000490 at 12:14:39.

a common specification with each other and with the first U.S. patent in the chain of priority, U.S. patent 6,932,017, which was in suit but dropped immediately before trial.  A000508 at 1:4-6, A000519 at 1:7-11, A000531 at 1:7-11, A010661, D47 at 2 n.1.  WG asserted the Bittleston patents were important to improve control of streamer arrays.

Entities and people relevant to Bittleston patents' title are:

- Schlumberger Ltd:  Incorporated in Curacao, it is the holding company of one of the largest corporate groups in the world, with numerous subsidiaries and related entities across the globe.

- STC:  A member of the Schlumberger group of companies, which transferred certain assets into a joint venture with Baker-Hughes in 2000 to form plaintiff WG.  A012699.

- The Geco companies:  Originally founded in Norway, and later acquired by the Schlumberger group.  A001495.

- WesternGeco L.L.C. ("WG"):  A Delaware limited liability company formed in 2000 as a joint venture between Schlumberger and Baker-Hughes, combining certain Schlumberger units and assets, including the Geco companies and certain property of STC, with those of Baker Hughes's subsidiary Western Geophysical.  A012689-797.  Since

2006, WG has been 100% owned by one or more Schlumberger entities, mainly STC.

- Dr. Bittleston:  Named inventor on the Bittleston patents.  He originally went to work for Geco in 1993.  A001495.

- Mr. Hillesund:  Named inventor on the Bittleston patents.  He originally went to work for Geco in 1994.  A004507-09.

The Bittleston patents name only Dr. Bittleston and Mr. Hillesund as inventors.  Both inventors, in separate writings dated February 26, 2001, assigned their rights to STC, and STC only.  A012195-98.  No other written assignments signed by the inventors or STC have been produced.

The February 2001 assignment from Dr. Bittleston is the only assignment on record in the PTO.[3]  It was first filed for the '017 patent, its cover page for recordation shows STC as assignee, and accordingly the PTO database shows STC as owner.  A012199-202.  The reel and frame citations for the '520 and '967 patents reference only this same assignment, yet the cover pages WG filed with the assignment state WG, not STC, as the assignee.  A012203-10.  There is no PTO assignment on record for the '607 patent.

The '017 patent shows WG as the assignee, despite the written assignment of record to STC.   This traces back to the prosecuting attorney writing on the Fee

---

[3] Mr. Hillesund's assignment was never recorded.

Transmittal Form that WG was to be published as the assignee.  A012211-12.  But this form expressly states it is not an assignment.  *Id*.

Like the '017 patent, each subsequent Bittleston patent was published (incorrectly) listing WG as the assignee, based on WG's misstatements to the PTO.  A000503 at [73], A000515 at [73], A000526 at [73].  In these cases, WG 1) filed a form under 37 C.F.R. § 3.73(b) for each application, stating *WG* had authority to prosecute based on the February 2001 assignment (to *STC*), and 2) filed cover pages with the Bittleston-STC assignment listing WG as owner rather than STC.  A013277, A013393, A013479, A012204-06, A012208-10.

Because WG's misstatements caused the patents to publish with WG wrongly listed as the assignee, lack of standing was not apparent.  But when ION discovered the defect in 2012, it pressed WG for proof of title.  A012216-20.  Lacking proper assignments, WG instead produced a series of corporate agreements:  A 1998 Cost Sharing Agreement among several Schlumberger companies, the 2000 Merger Agreement that formed WG, a November 2000 Technology Transfer Agreement, and a December 2000 Cost Sharing Agreement.  A012689-797, A012818-41, A012853-54, A012856-68.  WG asserted these agreements created a chain of title from the inventors to WG.  A012634.  The

11

*Confidential Material Redacted*

inventors are not parties to any of these agreements, however, and no writings from the inventors were ever produced to "start the chain."[4]

Additionally, since it could not produce any writing from the inventors other than the 2001 assignments to STC, WG pointed instead to opaque inventor testimony – Dr. Bittleston stating he believed that when he began work in 1993, his inventions would be assigned to his employer (which at that time was not WG), and Mr. Hillesund answering "yes" to a leading question as to whether Geco and later WG was the assignee. A001504, A004539-40, A012585 at 424:24-425:9. Neither inventor testified regarding the wording or form of any supposed writing.

WG's alternative theory was that ION "stipulated" to WG's legal title. WG pointed to a statement in one of ION's counterclaims, stating on "information and belief" WG was the Bittleston patents' assignee. A012912. This statement, however, was made in alleging WG had fraudulently procured the patents. *Id*. ION's "information and belief" was invited by WG's complaint and the face of the patents, to which ION was counterclaiming. Further, earlier in the same Answer, ION denied that each Bittleston patent was "duly and legally issued to WG as assignee." A012898-99 at ¶¶ 9–11.

---

[4] The two cost sharing agreements ████████████████ A012818-41, A012856-68. WG never claimed a chain of title based on these contracts in the PTO.

WG also alleged that ION stipulated to ownership in a joint jury charge, which summarized the case for the jurors in layman's terms.  A001144, A010839.  This simplified summary of WG's *allegations* was premised on WG's misinformation, as the charge says the inventors assigned their rights to WG, which WG has since conceded is inaccurate.  *See* D47 at 13 (alleging WG achieved title by a series of transfers, not by assignment).

## C.    WG Focused on Extraterritorial Activities for Liability and Damages

WG sued ION in 2009, and later joined one of its customers, Fugro, alleging infringement of dozens of claims under a variety of theories, including direct infringement under 271(a) by both ION and Fugro, indirect infringement under 271(b) and/or 271(c) by ION, and infringement through the export of ION's DigiFINs and Lateral Control software under 271(f)(1) and (f)(2).  On the eve of trial, WG dropped one patent ('017), and limited itself to a handful of claims from the remaining patents.  A010660-62, D47 at 2 n.1.  Fugro settled during trial.  The only infringement theory that WG took to verdict against ION was under 271(f).

For the accused exports, WG sought both a reasonable royalty (on all patents), and also lost profits (on the Bittleston patents) due to the alleged loss of certain specific bids to ION's foreign customers for services abroad.  Notably, WG did not allege lost profits from lost component sales in the U.S., because WG does not compete against ION in this market – or any other market.  ION sells

13

components for marine survey vessels. WG is in the business of selling marine seismic survey services and resulting survey data using its own fleet of seismic vessels. A001182, A002868-69. All surveys relevant to this case occurred outside U.S. territorial waters. A002868-69, A002223-24, A006190-91.

Nonetheless, over ION's *Daubert* motion and other objections, WG argued it was entitled to recover lost profits based on ION's component exports, because foreign third parties later assembled marine survey systems – fully outside the U.S. – and bid services in competition with WG's ships overseas. A010153-54 (*Daubert* motion), A000063-65 (denial), A011007, A006023-24 (jury instruction objections), A011064-66, A011056-59, A011477-82 (JMOL), A000031-34 (denial).

### D.    Pertinent District Court Rulings

ION moved for summary judgment of non-infringement, and WG moved for infringement and willfulness, on '520 patent claim 18 under 271(f)(1) and (f)(2). A012609-11; A010084, A010102. The court held that 271(f)(1) required only general intent for the supplied components to be combined overseas, not specific intent to circumvent the patent or induce what would otherwise be infringement if in this country. A000050-52. Based on this standard, the district court granted WG's summary judgment motion regarding 271(f)(1). A000053-54. The court denied WG's motion for summary judgment under 271(f)(2), however, holding

14

271(f)(2) requires intent to denigrate the patentee's rights, and WG did not meet this burden. A000056-57. The district court denied WG's motion for summary judgment on willfulness because, among other reasons, ION had evidence of invalidity. A000372-74. Indeed, all patents' validity remained in dispute through the verdict and post-trial motions. A000008, A000013 (denying ION's post-trial motions of anticipation, obviousness, and lack of enablement).[5, 6]

Armed with the infringement MSJ ruling, and notwithstanding that liability remained disputed for all claims, WG's trial presentation was driven by the message that ION was an adjudicated infringer, and that any liability the jury found would simply be cumulative to what the court had already found, so damages should be the jury's focus:

- "We are going to be seeking damages that are well over $100 million, perhaps over $200 million. We are talking about a significant amount of money. And you're going to find -- you will hear that the Court has already found that one claim of one of these patents has been infringed by the defendant. It's what we call the '520 patent." A001072 (voir dire).

---

[5] In view of the deferential standard of review of jury fact findings, and the word limits for this brief, ION does not appeal the various invalidity findings.

[6] ION had asserted a counterclaim under its '992 patent, but the court overcame disputed evidence by limiting the claims to the figures, especially in a second claim construction analysis at summary judgment based in large part on a comparison of ION's current DigiFIN to WG's Q-Fin. A000156. While this was error, ION's priority is to be free of WG, not further entangled with WG and Schlumberger.

- "The Court has already decided that ION and Fugro infringed one of these patents. So you will not be asked if ION and Fugro infringed, but rather, how many of these patents and claims they infringed, and how much they should pay for that infringement." A001182 (15th sentence of opening).

- "So you won't see much dispute over ION and Fugro's infringement. It's already been decided. You'll be asked how many patents they infringe. The question you'll face over and over again is whether you should let ION and Fugro get away with their infringement." A001211 (opening).

- "You know that Fugro and DigiFIN are accused of infringement in this case; correct? . . . You actually know that they've been found to infringe; right?" A002244 (cross of Fugro employee Lief Morton By)

- "You have been found to infringe, correct, sir? You understand that, right?" A003962 (cross of ION senior VP David Moffat).

- "You know that ION had been found to infringe WesternGeco's patent in this case; is that correct, sir?" A004660 (cross of former ION executive Charles Ledet).

- "And you know you have been found to infringe and that hasn't changed anything about how you've conducted your business, correct?" A005491 (cross of ION CEO Robert Peebler).

Since liability was undecided on all claims, and the MSJ went to only one cause of action on one claim, ION sought to prevent exactly this type of prejudice, but the court rebuffed ION at every instance. First, ION sought a motion *in limine* to alleviate "confusion of the issues." A010653 (denied at A010793). Then ION requested a clear preliminary instruction regarding the summary judgment. *Compare* A010840 (requested instruction) *with* A001145 (actual instruction); *see also* A10791-92 (requesting instruction delineating (f)(1) ruling from (f)(2) issue).

16

Finally, to help rectify what had ensued during trial, ION proposed a final jury

instruction that would isolate claim 18's ruling from the remaining open issues:

> I determined on June 29, 2012, that ION infringed Claim
> 18 of the '520 Patent by supplying DigiFIN and the
> Lateral Controller from the United States intending the
> two components be combined into a system with a
> control system configured to use a streamer separation
> mode that infringed Claim 18. You must accept my
> finding on infringement as it relates to Claim 18 of the
> '520 Patent under § 271(f)(1). ***You should not consider
> this finding in deciding the question of infringement as
> to any other claim or when deciding infringement
> under § 271(f)(2)***.

A011042 (emphasis added). The court rejected this language, and instead adopted

vague language that left the impression ION's intent to infringe had already been

proven for ***all*** claims under ***both*** 271(f)(1) and (f)(2):

> I also have already found that ***ION intended those
> components to be combined outside of the United States
> in a manner that would infringe the patent if the
> combining had been done in the United States***. In
> evaluating whether ION infringes the other asserted
> claims, ***you must accept my finding*** that ION intended
> the DigiFIN and the Lateral Controller to be combined
> outside of the United States.

A011087 (emphasis added).[7] The only limiting statement in the final charge was

in describing the case background, not with the questions to be answered by the

jury. A006111-12.

---

[7] In addition to ION's attempt to provide the clarifying instruction discussed above,
ION explicitly objected to the trial court's proposed 271(f)(1) instruction on the

In view of the MSJ ruling, and the court permitting WG to make repeated references to ION's "adjudicated infringement" and to characterize damages as the real issue, plus the confusing, erroneous jury instructions, it is not surprising that the jury found liability on all patents under 271(f)(1) and (f)(2), awarding WG $12,500,000 as a reasonable royalty and $93,400,000 as lost profits.  A000078.

ION moved for a new trial or JMOL on several grounds, but all relief on liability and actual damages was denied.  A000001-48.  Notably, however, as part of the post-trial order, the court found that ION's non-infringement and invalidity defenses were reasonable, and denied willfulness, rejected enhanced damages, and denied exceptional case and attorney fees.  A000025-30.  After the court's post-trial order, the court took up supplemental damages as well as a new request for willfulness.  A000389.  The court denied willfulness on all supplemental damages, including shipments completed post-trial while motions were pending.  A000397-99.

After ordering an accounting, the court first awarded WG supplemental damages under 271(f)(2) in the form of a reasonable royalty on each DigiFIN and a pro-rated amount of the lost profits at trial.  A000086-87.  But the court later

---

grounds that (1) the instruction did not present the proper intent standard, and (2) that ION's intent should be evaluated separately for each asserted claim. A005404-12.

vacated supplemental lost profits as unsupported by the record.   A000093-94, A012145-47, A012178.

Post-trial, ION uncovered WG's lack of standing on the Bittleston patents and moved for partial dismissal for lack of subject matter jurisdiction.  The district court initially said standing had been waived by delay.  A011942 (". . . that is a clear example of waiver . . .").  WG's counsel reminded the court that subject matter jurisdiction could not be waived, and suggested the court meant ION had admitted facts showing legal title, and hence standing.  A011944-45.  The court adopted WG's arguments in their entirety, despite WG's lack of a written assignment and the explicit assignments to STC.  A000005-08.

Final judgment was on May 7, 2014, and included a permanent injunction against export of the DigiFIN and Lateral Controller, damages as found at trial, a stipulated royalty for each DigiFIN sold during the supplemental damages period, costs, pre-judgment interest, and post-judgment interest, altogether exceeding $120,000,000 (most of which was lost profits awarded by the jury and interest on those lost profits), and that ION take nothing on its claims.  A000097-98.

## E.    Post-Verdict Changes in the Law

After briefing and oral argument on the post-trial motions but before the district court issued its June 19, 2013 Order, the Federal Circuit issued its decision in *Power Integrations, Inc. v. Fairchild Semiconductor International, Inc.*, which

held that "[o]ur patent laws allow specifically 'damages adequate to compensate *for the infringement*.' They do not thereby provide compensation for a defendant's foreign exploitation of a patented invention, which is not infringement at all." 711 F.3d 1348, 1371 (Fed. Cir. 2013) (internal citation omitted; emphasis in original).

Two days after *Power Integrations* issued, ION informed the district court of the decision and how it impacted the pending post-trial motions, and WG responded. A011948-75, A011976-2010. But the district court never addressed *Power Integrations*, or even acknowledged the submitted briefing. A000031-33.

Less than a week after the district court's order on post-trial motions, this Court, in response to the Supreme Court's decision in *Global-Tech Appliances, Inc. v. SEB S.A.*, —— U.S. ——, 131 S.Ct. 2060, 2068 (2011), resolved any potential doubt regarding the intent requirement for induced infringement in *Commil USA, LLC v. Cisco Sys., Inc.*, 720 F.3d 1361, 1368 (Fed. Cir. 2013), *reh'g en banc denied*, 737 F.3d 699 (Fed. Cir. 2013). The Court held that induced infringement "requires knowledge that the induced acts constitute patent infringement," and further held that since an invalid patent cannot be infringed, a good-faith belief of invalidity may negate the specific intent required for inducement. *Id.* at 1366, 1368. The Court also reinforced its knowledge requirement for inducement, distinguishing between "actual knowledge and willful blindness from recklessness and negligence." *Id*.

ION filed its first notice of appeal 28 days after the June 19, 2013 Order.[8]

A013535.  The parties, the district court and this Court agreed this notice did not

divest the district court of jurisdiction over accounting and injunction issues that

were still being resolved.  D8, D13.  During these proceedings, ION raised *Commil*

to defend against willfulness.  A012018.  ION filed a second notice of appeal

following the district court's order regarding supplemental damages and

injunction.  A013539.  ION's final notice of appeal was filed shortly after the May

7, 2014 Final Judgment.  A013543.  This Court stayed each of the prior appeals

pending conclusion by the district court of all issues, and consolidated all appeals.

## SUMMARY OF ARGUMENT

While the court was willing to revise its own ruling on supplemental

damages and even have additional proceedings on them (A012146-47), it was

adamant that standing should not undo the jury trial (A011942) ("That's a non-

starter. . . . that is a clear example of waiver.  That case should have been, that

issue should have been vetted and litigated years ago, and we are not going to take

it up now, absolutely not.").  This is understandable at a personal level, but legally

irrelevant.  Title plainly stands with STC, not WG, and timing plays no role in that

---

[8] ION filed a notice of appeal based on the district court's June 2013 post-trial
order, in light of the opinion in *Robert Bosch, LLC v. Pylon Mfg. Corp.*, 719 F.3d
1305 (Fed. Cir. June 14, 2013), and argued the district court's work on
supplemental damages was an accounting which could be stayed pending appeal.

determination. The same goes for lost profits and the *Power Integrations* opinion. Once that opinion issued, banning lost profits on extraterritorial activity, the district court was required to enter JMOL on the lost profits, no matter how much time and effort had been invested by the jury. Separately, the district court simply got the law wrong on intent under 271(f), and this infected the remaining liability issues.

WG lacks legal title to the Bittleston patents. The only record assignment at the PTO is Dr. Bittleston's 2001 assignment to STC, creating the presumption that STC is the assignee of his rights. WG's cobbled-together testimony, corporate documents and "admissions" do not establish a chain of title. WG never disclosed this chain of title argument to the PTO during prosecution (as required), but rather boldly asserted it was the assignee in multiple filings. WG lacked Article III standing on the Bittleston patents. Because there is no subject matter jurisdiction as to these three patents, those claims should be dismissed, and damages vacated.

The district court erred in granting summary judgment on '520 patent claim 18, as the court's ruling was predicated on the wrong mental state. *Global-Tech* and *Commil* confirm that for inducement, the defendant must have specifically intended infringement, and that a good-faith belief of invalidity may defeat that specific intent. Applied to 271(f), this requires intent to deliberately circumvent the patent or to otherwise induce what would be infringement with the same mental

22

state as in 271(b).  It is not enough to show that the components were to be combined overseas.

The district court's erroneous summary judgment ruling propagated through trial, because the district court allowed WG to label ION as an infringer over ION's objection, even though liability remained contested.  Between that and the erroneous jury instructions, ION's defense was over before it began.  This domino effect prevented ION from getting a fair trial.  In short, the jury was never asked the right questions on 271(f)(1), and the trial was bookended by the jury hearing ION was "guilty" in the court's instructions and WG's arguments.

Separately, the change in the law from *Commil* requires a new trial, where ION's good-faith belief that the patents are invalid may be used to defeat specific intent.  Given that the district court acknowledged the strength of ION's invalidity case on the very claim for which summary judgment was granted, as well as other claims as presented at trial, a *Commil* instruction would have led to an entirely different result, and this constitutes plain error.

Exacerbating the flawed liability holdings, the court permitted WG to pursue lost profits for services outside the U.S. performed by third parties with systems they assembled abroad and used overseas.  *Power Integrations* forbids this type of recovery.  This Court held that even if foreign sales are "the direct, foreseeable result of [ ] domestic infringement," U.S. patent law does not authorize lost profits

23

for those foreign sales because "foreign exploitation of a patented invention . . . is not infringement at all" and "the entirely extraterritorial production, use, or sale of an invention patented in the United States is an independent, intervening act that, under almost all circumstances, cuts off the chain of causation initiated by an act of domestic infringement."  711 F.3d at 1371-72.  Simply put, the U.S. Border acts as a bolt cutter through the chain of causation, and extraterritorial lost profits are not recoverable for the fully extraterritorial acts of others.

Furthermore, WG sought lost profits under the *Panduit* framework, which as explicitly reflected in the jury instructions, limits lost profits to competitors, but it was undisputed ION and WG were not competitors.  In effect, the district court improperly allowed WG to shift the focus from WG's ***actual foreign*** competitors in the overseas marine geophysical survey market to ION's U.S. component exports.  The Court's denial of JMOL on this issue was error because there is no evidence to support the finding that WG and ION competed in the same market: to the contrary, ION sold components in one market and WG sold services in another.

## ARGUMENT

### I.    WG Lacks Standing for the Bittleston Patents

A party that lacks title to a patent lacks standing to file a claim for infringement.  *Tyco Healthcare Grp. LP v. Ethicon Endo-Surgery, Inc.*, 587 F.3d 1375, 1378 (Fed. Cir. 2009).  "Standing is a legal question and jurisdictional issue

24

that this [C]ourt reviews without deference." *Morrow v. Microsoft Corp.*, 499 F.3d 1332, 1336 (Fed. Cir. 2007). "[T]o assert standing for patent infringement, the plaintiff must demonstrate that it held enforceable title at the inception of the lawsuit." *Paradise Creations, Inc. v. UV Sales, Inc.*, 315 F.3d 1304, 1309 (Fed. Cir. 2003). WG had the burden to demonstrate, by a preponderance of the evidence, that it met this requirement. *Gellman v. Telular Corp.*, 449 F. App'x 941, 943 (Fed. Cir. 2011) (citing *McNutt v. Gen. Motors Acceptance Corp. of Ind.*, 298 U.S. 178, 189 (1936)).

The district court, however, improperly shifted the burden to ION to show WG did ***not*** have title to the patents, by holding that WG should be presumed to have title based on the published patents' faces. A000007. But if there is any presumption, it that is the party named in the "assignment of record" at the PTO holds title, not the party listed on the patent face. *See* 35 U.S.C. § 261; *SiRF Technology, Inc. v. International Trade Com'n*, 601 F. 3d 1319, 1328 (Fed. Cir. 2010); *U.S. Philips Corp. v. Iwasaki Elec. Co.*, 505 F.3d 1371, 1375 (Fed. Cir. 2007) ("the assignation printed on the face of a patent is not a conclusive indication of the patent's current ownership. . . ."). This is because 1) patents are assignable by written instrument, 2) the PTO does not substantively examine filings regarding ownership, and 3) Section 261 presumes legal title according to the assignment recorded in the PTO database.

25

In this Court, WG argued that presumption of ownership arose from the PTO deciding that WG had valid assignments that gave it the right to prosecute the Bittleston patents. D47-1 at 17. This argument was based on a form WG filed in each application pursuant to 37 C.F.R. § 3.73(b). This pre-printed form reflects § 3.73(b)'s requirement for either an assignment of record from the inventor to the party prosecuting the application (designating reel and frame), or alternatively, a description of the chain of title from the inventor that shows the applicant's right to proceed. 37 C.F.R. § 3.73(b)(i)-(ii); MPEP § 324.X.

Here there is neither. WG made no chain of title argument to the PTO, and the statement regarding assignment of record was demonstrably wrong. WG pointed to the February 26, 2001 assignment as rationale for why *WG* was entitled to prosecute the patents. But the assignment at the reel and frame is the assignment to *STC*. The PTO did not catch this incongruity, however, because the PTO does not decide the validity of assignments, only that the form has been completed. 37 C.F.R. § 3.54; MPEP §§ 301, 324. Since there is no "examination" on the merits, there is no agency decision entitled to deference. *Compare Kaempe v. Myers*, 367 F.3d 958, 961 (D.C. Cir. 2004) (Patent Office's filing of an assignment is a ministerial act). The PTO never decided that WG was the successor in interest to STC or that STC was not the assignee under the 2001 assignment. Rather, the PTO filed the forms as ministerial acts. While WG's

26

misstatements caused the patents to be published with WG listed as assignee, they do not create a presumption of title. *U.S. Philips Corp.*, 505 F.3d at 1375.

The burden to show legal title was on WG. By flipping this burden, WG avoided dismissal even though it could not produce an assignment from the inventors to WG or a chain of title from the inventors to WG.

### A.    ION Has Not Waived and Is Not Estopped from Challenging Standing, Particularly in Light of WG's Misstatements

Parties cannot stipulate to or waive subject matter jurisdiction; it must be examined by a court even if first raised late in the proceedings. *See, e.g., Tyco Healthcare Grp. LP*, 587 F.3d at 1378 (title and standing first raised during trial); *Lucent*, 543 F.3d at 716 (case dismissed for lack of standing post-verdict). Where chain of legal title is asserted through contracts, those contracts are reviewed *de novo* on appeal. *Tyco*, 587 F.3d at 1378-79 (reviewing contractual chain of title *de novo* even in light of witness testimony at trial regarding the contracts); *see also Gellman*, 449 F. App'x at 943.

Here, the district court held that WG had standing because ION purportedly admitted that WG had legal title to the Bittleston patents. Even if this "admission" were true, it is irrelevant. *Boeing Co. v. Comm'r of Patents and Trademarks*, 853 F.2d 878, 881, (Fed. Cir. 1988) ("The issue of standing calls into question the power of the court to hear and decide a case, and it is impossible for a party to

waive this requirement."). Any argument that ION admitted that WG was assignee is tantamount to stipulating to jurisdiction, which the law forbids.

Moreover, the district court's finding was erroneous. The district court held that (1) a statement "on information and belief" in one paragraph of ION's Tenth Counterclaim, and (2) ION's agreement to the jury charge summarizing WG's allegations, somehow "admitted" WG was the patents' assignee, and accordingly standing and jurisdiction. WG does not claim that ION admitted to specific facts such as when, where, or how assignments were made, nor the wording of assignments; rather the supposed "admissions" are to the ultimate issue. But that is no different from an impermissible stipulation to jurisdiction. *See Owen Equip. & Erec. Co. v. Kroger*, 437 U.S. 365, 368–70, 377 (1978) (finding no jurisdiction where defendant had admitted in its answer to facts establishing diversity of citizenship, which at trial were found to be false); *Swift & Co. v. Hocking Valley R. Co.*, 243 US 281, 289-90 (1917) (rejecting parties' stipulation to a fact contradicted by the record, holding that, "[i]f the stipulation is to be treated as an agreement concerning the legal effect of admitted facts, it is obviously inoperative; since the court cannot be controlled by agreement of counsel on a subsidiary question of law.").

And in any event, these "admissions" do not withstand any standard of review. The alleged admission in ION's Tenth Counterclaim states that "on

information and belief" WG is the patents' assignee. A012912. The Tenth

Counterclaim was in ION's original responsive pleading. This statement is

followed by a statement that WG fraudulently procured the patents and is preceded

by denials in the Answer that the patents were validly issued to WG. *Id*.

Moreover, ION's "information and belief" statement was driven by WG's

erroneous PTO filings, which caused the patents to publish with WG listed as

assignee. WG's lack of title was masked by its filing cover sheets with the Dr.

Bittleston-**STC** assignment for the '520 and '967 patents[9] incorrectly stating that

**WG** was the assignee. A012204, A012208. In view of WG's PTO filings, and

reading ION's Answer and Counterclaim as a whole, a single phrase plucked out

of ION's responsive pleading cannot be fairly used as an admission.

Likewise, the jury charge that WG had an assignment from the inventors

was again premised on WG's allegations. ION's agreement or failure to object to a

charge summarizing WG's allegations is nothing more than an admission that this

charge summarized WG's **allegations** – accurate or not.

WG's legal argument on the "admission" issue also fails. WG relies on

*Pandrol USA LP v. Airboss Ry. Prods.*, 320 F.3d 1354, 1367-68 (Fed. Cir. 2003),

but that case is very different on its facts. In *Pandrol*, this Court determined

"standing based on an examination of the whole record." *Id*. at 1368. The record

---

[9] There is no PTO assignment on record for the '607 patent.

contained a signed and witnessed confirmation of assignment, which was itself recorded with the PTO.  This Court noted that there was "no evidence or argument to rebut this evidence of patent ownership."  *Id*.  Based on the record as a whole, and the lack of evidence or argument to rebut the recorded evidence with the PTO, the defendant's statement in its counterclaim was ***consistent with, not dispositive of,*** this confirmation of assignment as recorded in the PTO.  *Id.* at 1368.  In contrast, as in *Owen* and *Swift*, here the relevant documents – the February 26, 2001 assignments – ***do exist***, and directly ***refute*** any "admission."  Further, the only recorded assignment is the Dr. Bittleston-STC assignment, which is presumed controlling under Section 261.

Besides the supposed admissions, the district court also drew an inference against ION based on its delay in raising standing.  A000006-07, A011942.  This inference has no basis in law.  *Spine Solutions, Inc. v. MedTronic Sofamor Danek USA, Inc.*, 620 F.3d 1305, 1318-19 (Fed. Cir. 2010) (rejecting argument that "because Medtronic allegedly treated the various Synthes entities as one throughout discovery" standing was waived because it "is jurisdictional and not subject to waiver'") (citing *Pandrol*, 320 F.3d at 1367).

Moreover, the district court cannot reasonably hold against ION delay predicated by WG's misinformation.  Courts do not permit a party to exploit to its own advantage an unfair circumstance it created.  *Compare Regional Props., Inc.*

30

*v. Financial & Real Estate Consulting Co.*, 752 F.2d 178, 183 (5th Cir. 1985) (holding that the equitable defense of estoppel is not available to a party with unclean hands because "[a]n equitable defense cannot be used to reward inequities nor to defeat justice."). ION should not be penalized for delay because WG's conduct masked the standing problem.

### B.    There Is No Assignment from the Inventors to WG in the Chain of Title

Putting aside WG's distractions, this issue is straightforward. WG cannot produce an assignment of legal title to the Bittleston patents that complies with § 261, other than the February 2001 assignments to STC. *Speedplay, Inc. v. Bebop, Inc.*, 211 F.3d 1245, 1250 (Fed. Cir. 2000) (a plaintiff must "produce a ***written instrument documenting the transfer of proprietary rights*** in the patents.") (emphasis added); *see also Bd. of Trs. of the Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc.*, 131 S. Ct. 2188, 2195 (2011) ("A patent is property and title to it can pass only by assignment.") (quoting *United States v. Dubilier Condenser Corp.*, 289 U.S. 178, 187 (1933)). To confer title, the writing must include a present, active transfer of rights. *Bd. of Trs. of the Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc.*, 583 F.3d 832, 841–42 (Fed. Cir. 2009) (finding present assignment in the language "I will assign and do hereby assign"), *aff'd*, 131 S. Ct. 2188 (2011); *see also Gellman v. Telular Corp.*, 449 F. App'x 941, 944–45 (Fed. Cir. 2011) (collecting cases).

The assignment from Dr. Bittleston to STC meets these requirements. Although the assignment from co-inventor Mr. Hillesund was never filed of record, it too is dated February 26, 2001 to STC, and meets these requirements. No further or other assignments from the inventors, or STC, were produced.

In response to these clear written assignments, WG has responded with vague testimony that there were earlier (unproduced) assignments between the inventors and their prior employers. Dr. Bittleston stated that when he went to work for Geco in 1993, there was a document, or that he otherwise understood his employer would own his inventions. A001496, A001504. Mr. Hillesund similarly stated that when he went to Geco in 1994, there was an understanding or a document that his employer would own his inventions. A004508, A004539-40, A012585 at 424:24-425:9.

But these alleged documents were never produced, their wording was never testified to, and there is no evidence that – even if they exist – they meet § 261's requirements. This conclusory testimony cannot overcome the presumption of title based on the recorded assignment to STC. Further, while the Federal Rules of Evidence do not control the district court's legal decisions, by analogy, this testimony would violate the rules that require the "original writing . . . in order to prove its content . . ." [R. 1002] or a "duplicate" [R. 1003], and/or allow testimony to prove the content of a document *only when* it is the statement of the party

32

*against* whom it is offered [R. 1007].  But neither witness ever worked for ION; and Dr. Bittleston works for WG even today, appearing for it at trial.  A001495.

Moreover, this testimony contradicts the only existing writings because the 2001 STC assignments would have been pointless if the inventors had previously assigned their rights to others.  Further, it contradicts WG's 3.73(b) forms that refer to the February 2001 assignments as the "effective" assignments.  A013277, A013393, A013479.

The district court seized on language in the February 2001 assignments stating the assignors "acknowledge [they] have sold" the rights to STC, *i.e.,* that something must have occurred in the past.  A000008, A012195-98.  While the assignments do use the past tense "have sold," the effective assignment language in the very same sentence states: "by this assignment, [I] do sell, assign, transfer and convey unto Assignee [STC] . . . my invention. . . ." A012195-98.  The district court ignored this language, but without it, the record would have no legally-operative assignment.

The February 2001 assignments are present assignments, not a confirmation of things past, they are the only operative assignments, and they are to STC, not WG.

### C.    The Corporate Agreements Pre-Dating the Inventors' Assignments Cannot Convey Legal Title to WG

The 1998 and 2000 corporate agreements relied on by the district court cannot and do not confer title.  A012780-85, A012853-54.  Neither Mr. Hillesund nor Dr. Bittleston was party to any of these agreements, and without their involvement, there is no beginning to a "chain" of title.

WG now relies on a 1998 Cost Sharing Agreement among several Schlumberger entities, which expired with the 2000 merger, and pre-dates the effective assignments of record in 2001.  A012818; *see also* D47 at 14.  But that agreement could not transfer title because neither inventor signed it – indeed, neither did their employers.  Further, this agreement was prepared for purposes of ██████████████████████ not the Patent Act.  A012819.

WG argues that the 2000 Merger Agreement and November 2000 Technology Transfer Agreement transferred intellectual property rights held by STC (as of the merger's date) to WG, and asserts the Merger Agreement also would have merged Geco and Western Geophysical into WG.  D47 at 13, 15.  However, since the February 2001 assignments to STC ***post-date*** the merger, STC did not own these rights ***prior to*** the merger, and there could be no transfer of the Bittleston patents.

*Confidential Material Redacted*

WG also argues that the December 2000 Cost Sharing Agreement would have transferred future rights to WG from STC (*e.g.*, those obtained in the 2001 assignments).  D47 at 15.  But STC is not a party to this 2000 Cost Sharing Agreement, which, like the 1998 contract, was a ████████████ not an assignment compliant with § 261.  A012856.

There is no chain of title under these corporate contracts.  Based on the clear and ambiguous written assignments to STC, WG does not, and never did, have standing to bring suit on the Bittleston patents.  All claims related to those patents must be dismissed due to lack of subject matter jurisdiction, and lost profits, royalties and the injunction awarded based on those claims vacated.

## II.    The District Court's Improper 271(f) Rulings Require a New Trial

The district court repeatedly rejected this Court's and the Supreme Court's precedent in refusing to apply the correct mental state for 271(f)(1), starting with the summary judgment ruling, proceeding with the jury instructions, and culminating with the JMOL order.

First, the district court's summary judgment ruling on '520 patent claim 18 was predicated on an incorrect standard for the mental state to induce infringement.  Given 1) the Supreme Court's 2011 *Global-Tech* decision, 2) the plain language of §§ 271(b), (c), and (f), and 3) § 271(f)'s legislative history, when deciding summary judgment the district court should have required specific intent to

infringe or circumvent the patent. Instead, the district court reached the opposite result, holding that 271(f)(1) was "unambiguous and can be read in only one way," requiring merely intent that the products exported be combined. A000050, A000052. This is effectively strict liability for component exports.

Second, the district court's error continued through trial. The summary judgment ruling started a domino effect, infecting the court's opening instructions to the jury, WG's trial presentation, and the jury charge. Ultimately, the erroneous intent instructions, and the repeated effect of being labeled an adjudicated infringer over ION's objection, without any finding of liability or instruction explaining the limits of the ruling as requested by ION, fatally infected the jury verdict.

Third, *Commil*, decided after the district court's post-trial order, further confirmed the district court's error. *Commil* held a reasonable non-infringement belief is a defense to inducing infringement, including a reasonable belief in invalidity since an invalid patent cannot be infringed.

Summary judgment is reviewed *de novo*. *MeadWestVaco Corp. v. Rexam Beauty and Closures, Inc.,* 731 F.3d 1258, 1264-65 (Fed. Cir. 2013). The Fifth Circuit reviews jury instructions for abuse of discretion. *Jowers v. Lincoln Elec. Co.*, 617 F.3d 346, 352 (5th Cir. 2010). "A district court abuses its discretion when its ruling is based on an erroneous view of the law or a clearly erroneous assessment of the evidence." *In re Sealed Appellant*, 194 F.3d 666, 670 (5th Cir.

36

1999). "Whether a jury instruction on an issue of patent law is erroneous is a matter of Federal Circuit law that is reviewed *de novo*." *Commil*, 720 F.3d at 1365-66. A jury's verdict must be set aside if "those instructions were legally erroneous" and "the errors had prejudicial effect." *Advanced Display Sys., Inc. v. Kent State Univ.*, 212 F.3d 1272, 1281 (Fed. Cir. 2000) (internal citations omitted). Only where the erroneous instruction "could not have changed the result" will the error be deemed non-prejudicial. *CytoLogix Corp. v. Ventana Med. Sys., Inc.*, 424 F.3d 1168, 1174 (Fed. Cir. 2005); *accord*, *Jimenez v. Wood Cnty., Tex.*, 621 F.3d 372, 376 (5th Cir. 2010) ("the error could . . . have affected the outcome of the case"). Here, the jury was never asked the right questions, and had it been, it would have reached the opposite result.

## A.   The Court Applied the Wrong Intent for 271(f)(1)

The district court erred by negating 271(f)(1)'s specific intent requirement, refusing to apply an intent level analogous to 271(b). *Liquid Dynamics Corp. v. Vaughan Co.*, 449. F.3d 1209, 1222-23 (Fed. Cir. 2006) (relying on this Court's *271(b) Fuji Photo* case in holding that "inducement" under *271(f)(1)* required "a requisite showing of intent" and determining whether the defendant "intended for its [accused] design to infringe the claims.") (*citing Fuji Photo Film Co. v. Jazz Photo Corp.*, 394 F.3d 1368, 1377 (Fed. Cir. 2005)); *see also Limelight Networks v. Akamai Technologies*, 134 S. Ct. 2111, 2118 (2014) (acknowledging the only

37

difference between 271(b) and 271(f)(1) was the need for underlying direct infringement:  "Section 271(f)(1) reinforces our reading of § 271(b). . . .  As this provision illustrates, when Congress wishes to impose ***liability for inducing activity*** that does not itself constitute direct infringement, it knows precisely how to do so.") (emphasis added).

Section 271(b)'s mental state requirement – and the need for specific intent for indirect infringement – was reinforced in *Commil*.  This Court, relying on *Global-Tech*'s holding that induced infringement "requires knowledge that the induced acts constitute patent infringement," distinguished "actual knowledge and willful blindness from recklessness and negligence," and re-confirmed that general intent to induce components to be combined is not enough; instead there must be specific intent to induce infringement.  *Commil*, 720 F.3d at 1368.

Sections 271(b) and (f)(1) both recite the same inducement language, and this Court's interpretation of "actively induce" in both statutes should be the same.[10]  It is a "normal rule of statutory construction that identical words used in different parts of the same act are intended to have the same meaning." *Agro Dutch Industries Ltd. v. United States*, 508 F.3d 1024, 1032 (Fed. Cir. 2007), quoting

---

[10] Model jury instructions from the Federal Circuit Bar Association have equated the mental state requirement of 271(f)(1) and 271(b).  These instructions were submitted to the trial court and appear in the joint appendix at A012348.

*Gustafson v. Alloyd Co.*, 513 U.S. 561, 570 (1995).  If the statutes' plain language was not clear enough, Congress eliminated any ambiguity when it explicitly stated that it intended to use the 271(b) standard for active inducement in 271(f)(1):  "The term 'actively induce' is drawn from existing subsection 271(b) of the patent law, which provides that whoever actively induces patent infringement is liable as an infringer."  A012551.

These holdings and legislative history make sense on a policy level, as it would be illogical for there to be a ***lesser*** standard to induce outside the U.S. than inside the U.S.  The Congressional record shows that 271(f) was to fix the "loophole" for deliberate circumvention of a patent created by the *Deepsouth* decision.  A012551.  In *Deepsouth*, the adjudicated infringer sought to avoid future liability by exporting unassembled sections of its shrimp deveiners for assembly overseas.  *Deepsouth Packing Co. v. Laitram Corp.*, 406 U.S. 518, 523-24 (1972).  Intent was not in doubt.  Congress expressed as its first "principal aim" for the legislation:  "To declare it to be patent infringement to supply components of an invention patented in the United States for final assembly abroad ***if the purpose of the shipment abroad is to circumvent a U.S. patent***."  A012546 (emphasis added).  Congress simply did not intend to impose liability on a U.S. export where there was no intent to circumvent the law or induce otherwise infringing activity.

## B.    The Error Prejudiced ION at Trial

The district court's holding on 271(f)(1)'s mental state in the summary judgment ruling is clear on its face.  The district court granted summary judgment on claim 18 on 271(f)(1) without requiring any intent to induce otherwise infringing acts or circumvent the patents, but simultaneously denied summary judgment of infringement of the same claim under 271(f)(2) because "the record evidence does not meet the high burden of demonstrating knowledge of infringement of the '520 patent."  A000049-57.

The error at trial is stark.  The jury was not instructed to consider ION's intent, again over ION's objection, in deciding whether it infringed the remaining claims under 271(f)(1).  A010913, A011041-42, A005404-08, A006018.  Moreover, on JMOL, the district court found that ION's non-infringement defenses were ***reasonable***.  A000027 ("ION's litigation defense for the '038 Patent was that DigiFIN was not an ASPD . . .  The Court finds and holds that this was a reasonable defense"); A000025-27 (regarding other patents).

Accordingly, it is clear that ION was prejudiced by the erroneous MSJ ruling and jury instructions, and a new trial is required for all 271(f) liability under the appropriate mental state requirement.[11]

---

[11] A new trial on 271(f) liability (based on this or any of the raised arguments) also necessitates vacating all damages findings, including damages awarded at trial as

### C.    The Court's Error Regarding 271(f)(1) Necessarily Infected 271(f)(2)

The court's error on 271(f)(1) also necessitates a new trial as to liability for the other claims regarding 271(f)(2).  The prejudice resulting from being labeled an adjudicated infringer is undeniable, particularly in view of how the district court allowed WG to harp on it (*see* pages 15 to 16 infra) over ION's objections and proposed clarifying instructions.  A010653, A010913, A011042, A005404-08, A005411-12.

In *voir dire*, it was clear the jury was already confused about the summary judgment's impact.  A001080 ("If one of the patents has already been found to be infringed on, is this case about infringing a patent or is it about damages?").  To avoid this exact problem, ION moved *in limine* to exclude or limit references to the summary judgment ruling to alleviate "confusion of the issues" (A010653), but this request was overruled (A010793).

Once the district court rejected ION's motion, WG answered the jury's question, arguing the case *was* really only about damages.  A001182 ("The Court has already decided that ION and Fugro infringed one of these patents.  So you will not be asked if ION and Fugro infringed, but rather, how many of these

---

well as supplemental damages, which are premised on the underlying liability finding.

patents and claims they infringed, and how much they should pay for that infringement.").

To a lay jury, continually being improperly called an infringer under 271(f)(1) on one claim was inseparable from the issues regarding 271(f)(1) and (f)(2) on the other claims. *Vidrine v. Kansas City S. Ry. Co.*, 466 F.2d 1217, 1221 (5th Cir. 1972) (observing that a partial retrial is only appropriate where issues are "so distinct and separable" that there will be no "injustice" to either party); *Gasoline Products Co. v. Champlin Refining Co.*, 283 U.S. 494, 500-501 (1931) (same).[12]

The prejudice was exacerbated by the court's refusal of ION's request to instruct the jury not to use the finding on 271(f)(1) while evaluating liability under 271(f)(2). WG capitalized on this error by arguing that the mental state required for 271(f)(2) had ***already been found*** by the court. A006201; see also A006196-97. Put differently, one of the main defenses to 271(f)(2) – that ION did not believe it infringed and thus lacked the requisite mental state – was eviscerated by the court's summary judgment ruling, and WG exploited this ruling from opening to closing.

---

[12] This is especially true since liability had not been established even for claim 18, since validity was still at issue.

42

The district court's "curative instruction" to distinguish between what had already been determined, and what was left to be determined by the jury, was utterly ineffective.  In the opening jury instructions, the district court referred to ION as already being found to infringe.  A001145.  ION repeatedly requested instructions stating "You should not consider this [summary judgment] finding in deciding the question of infringement as to any other claim or when deciding infringement under § 271(f)(2)," but the court refused,  A010913, A011042, A005404-08, A005411-12.  Instead, the court adopted an instruction that was akin to instructing a jury that it was up to them to determine if the defendant had run a stop sign, but that the court had already determined there was a stop sign and the defendant did not stop:

> I also have already found that **ION intended those components to be combined outside of the United States in a manner that would infringe the patent if the combining had been done in the United States**.  In evaluating whether ION infringes the other asserted claims, **you must accept my finding** that ION intended the DigiFIN and the lateral controller to be combined outside of the United States."

A006123-24 (emphasis added).

Without ION's requested instruction to not consider the summary judgment finding in deciding the separate question of infringement under 271(f)(2), WG then told the jury to do exactly that:

43

> Did ION have some reasonable basis -- this is another
> fact for willfulness you will see -- to believe it didn't
> infringe? No. The Court has already found before we
> even got here that they infringed one claim of the patent.

A006201; *see also* A006196-97. The district court improperly labeled ION an

adjudicated infringer because it misapplied the law. The district court

compounded this error by allowing WG to argue 271(f)(2)'s requirements were

satisfied precisely because ION was already found to be an adjudicated infringer

under the district court's lower standard for 271(f)(1). *Id.*[13]

To illustrate the prejudice, consider the hypothetical situation where

summary judgment had ***not*** been granted, but where WG continually referred to

ION as an adjudged infringer; in that situation, a new trial would be granted, as

new trials have been granted for much less inflammatory rhetoric. *See, e.g.*,

*Whitehead v. Food Max of Mississippi, Inc.*, 163 F.3d 265, 277 (5th Cir. 1998)

(finding verdict was based on passion and prejudice, such as counsel's repeated

reference to Kmart as not a local company). The situation here is no different from

the jury's perspective. On this record, the trial court's and jury's findings of

infringement should be vacated, and this case should be remanded for a new trial.

---

[13] That the jury found willfulness is irrelevant since it is based on the same errors.

### D.    Plain Error Based on the Subsequent *Commil* Decision Requires a New Trial

An alternative basis for a new trial on 271(f) liability is the subsequent *Commil* decision, which now necessitates proof that ION had no good faith belief in the invalidity of the asserted patents.

In *Commil*, the panel wrote "[w]e now hold that evidence of an accused inducer's good-faith belief of invalidity may negate the requisite intent for induced infringement." *Commil*, 720 F.3d at 1368. This decision occurred one week after the court's denial of ION's post-trial motions. A000001-48.[14]

As argued above, the intent requirement under 271(f)(1) is identical to 271(b). And since 271(f)(2) also requires intent to cause infringement, *Commil* also applies to 271(f)(2). The change in law created by *Commil* was discussed at length in the dissent from denial of rehearing *en banc*, explaining that the decision "rearranges the legal foundation that underpins the enforceability of valid patents and the finding of liability for infringement." *Commil USA, LLC v. Cisco Systems,*

---

[14] Even though *Commil* issued after the post-trial rulings, it is plain error under Fifth and Federal Circuit law. *Johnson v. U.S.*, 520 U.S. 461, 468 (1997) ("where the law at the time of trial was settled and clearly contrary to the law at the time of appeal-it is enough that an error be 'plain' at the time of appellate consideration."); *U.S. v. Williamson*, 183 F.3d 458, 464 (5th Cir. 1999) (citing *Johnson* and finding plain error based on a change in the law); *Voda v. Cordis Corp.*, 536, F.3d 1311, 1328 n.10 (Fed. Cir. 2008) (holding that judicial decisions operate retrospectively), *citing Rivers v. Roadway Express, Inc.*, 511 U.S. 298, 311-12 (1994) and *Harper v. Virginia Dep't of Taxation*, 509 U.S. 86, 97, 113 S.Ct. 2510 (1993).

*Inc.*, 737 F.3d 699, 701 (Fed. Cir. 2013).  This dissent to *en banc* review was published after this Court docketed, and stayed, the first appeal.  D1, D13.

This fundamental change is now also reflected by subsequent changes in practices.  For example, Northern District of California Model Patent Jury Instruction 3.9, "Inducing Patent Infringement," now requires proof from the patentee that the alleged infringer "not have had a good faith belief the patent was invalid."  A012506; *see also* A013593 (new FCBA instructions).

ION repeatedly demonstrated throughout the case its good faith belief in invalidity.  ION moved for summary judgment on these defenses (A010008-48, A010049-83); tried them to the jury; and filed post-trial motions against the adverse verdict (A011125-59, A011344-75).  Although ION did not ultimately prevail, the district court agreed the defenses were objectively reasonable.  A000025-28 ("[t]hough the Court does not find for ION on invalidity, its arguments are not objectively baseless.").  In fact, the court noted that for one of the asserted references (U.S. Patent No. 5,790,472, the "Workman Reference"), it "does read the quoted language as ***potentially anticipating*** the streamer separation mode of the '520 patent."  A000225-26 (emphasis added).

The record establishes that ION presented reasonable, objectively supported invalidity defenses.  Yet ION's good faith belief – and its consequent lack of intent to cause infringement – was not considered by the court or the jury when weighing

intent for infringement.  This was plain error that affected ION's substantial rights, and seriously affected the trial's fairness.  *Crawford v. Falcon Drilling Co., Inc*., 131 F.3d 1120, 1124 (5th Cir. 1997).  This is especially so given how WG repeatedly leveraged an MSJ ruling that could not have issued under *Commil*.

ION is entitled to a new trial under both 271(f)(1) and (f)(2) with jury instructions based on the new *Commil* decision, and to have the MSJ for claim 18 reversed based on *Commil*.

### III.    Lost Profits are Unavailable as a Matter of Law

The availability of lost profits is a question of law for the court.  *Wechsler v. Macke Int'l Trade, Inc*., 486 F.3d 1286, 1293 (Fed. Cir. 2007).  Only after the court has decided as a matter of law that lost profits are available is the jury permitted to determine the amount of those lost profits.  *Id*.  Even before *Power Integrations*, the district court should have foreclosed foreign lost profits.  But once *Power Integrations* directly refuted the **same** flawed causation theory WG relied upon, the district court should have vacated the lost profits award.  Instead, it did not address *Power Integrations*, but rather left intact the type of damages model this Court had deemed fatally flawed.  Besides extraterritoriality, the court should not have allowed *Panduit* to be misapplied to award lost profits where the parties were admittedly not competitors and the jury instructions explicitly required that.

**A.    The District Court Failed to Consider the Post-Verdict**
***Power Integrations* Decision Banning Extraterritorial Lost**
**Profits**

Alleged infringement in this case is limited to ION's supply of components

from the U.S.  Damages are correspondingly limited to what happened in the U.S.:

the supply of components, with either a reasonable royalty on the components

supplied or lost profits from competing sales of the components.  This Court

recognized this principle most recently in *Power Integrations*, where it considered

whether lost profits for foreign sales that would have been made, but for domestic

infringement, were recoverable:

> Power Integrations argues that it was foreseeable that
> Fairchild's infringement in the United States would cause
> Power Integrations to lose sales in foreign markets.
> Thus, Power Integrations argues, the law supports an
> award of damages for the lost foreign sales which Power
> Integrations would have made but for Fairchild's
> domestic infringement.

*Power Integrations*, 711 F.3d at 1370.  This Court found such foreign lost profits

are ***not*** recoverable, holding that "[o]ur patent laws allow specifically 'damages

adequate to compensate *for the infringement*'" and that "the entirely extraterritorial

production, use, or sale of an invention patented in the United States is an

independent, intervening act that, under almost all circumstances, cuts off the chain

of causation initiated by an act of domestic infringement."  *Id.* at 1371-72 (internal

citation omitted; emphasis in original).

*Power Integrations* confirmed that "but-for" causation and the goal of full compensation are trumped by preclusion of liability for fully extraterritorial activity, as articulated in *Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437 (2007). Specifically, this Court held that even if defendant Fairchild's foreign sales wins were "the direct, foreseeable result of Fairchild's domestic infringement," Power Integrations was nevertheless unauthorized to recover damages based on these foreign sales because "foreign exploitation of a patented invention . . . is not infringement at all." 711 F.3d at 1371. This holding comported with the Supreme Court's edict that "[t]he [general] presumption that United States law governs domestically but does not rule the world applies with particular force in patent law." *Microsoft v. AT&T*, 550 U.S. at 454-55. "Our patent system makes no claim to extraterritorial effect;" our legislation "'d[oes] not, and [was] not intended to, operate beyond the limits of the United States,' and we correspondingly reject the claims of others to such control over our markets." *Deepsouth*, 406 U.S. at 531 (quoting *Brown v. Duchesne*, 60 U.S. 183 (1856)).

*Power Integrations* squarely applies here: the subsequent, entirely extraterritorial use by ION's customers of DigiFINs and Lateral Controller software in providing services in competition to WG abroad is non-infringing activity. The purported infringement relates only to supplying a component from within the United States. Even if the foreign use of a system incorporating the

49

component to bid and perform services was foreseeable from ION's purported infringement, under *Power Integrations*, any lost profits due to that foreign use are not recoverable. Since WG does not sell competitive components and has no claim to lost profits resulting from lost component sales due to ION's U.S. exports, ION's liability should be constrained to a reasonable royalty on its accused products.[15]

### B.    This Court and the Supreme Court Have Recognized That Damages Cannot Be Tied to Purely Extraterritorial Acts

*Power Integration,* like the body of law it explains, is based on sound public policy. If purely extraterritorial acts gave rise to U.S. liability, U.S. patents would effectively become worldwide patents, and worldwide companies would be potentially subject to multiple damages verdicts – in multiple jurisdictions – for the exact same acts. Under the district court's 271(f)(1) ruling, a U.S. exporter of a non-infringing component with no intent to induce infringement or circumvent a patent would be liable for lost profits from use of systems assembled and used abroad in foreign competition.

---

[15] The jury's award already includes a reasonable royalty for the same components that gave rise to lost profits, and thus even if lost profits are reversed, there is no basis to increase the reasonable royalty award. As illustrated by the district court's comments at the March 7, 2014 hearing where it withdrew all lost profits from the supplemental damages award, there was no way to separate out which units were subject to royalties and which to lost profits. A012145-47, A012178.

But foreign law, not United States law, governs the extraterritorial use of a

patented invention. *See Johns Hopkins Univ. v. CellPro, Inc.*, 152 F.3d 1342, 1366

(Fed. Cir. 1998) ("to the extent that Hopkins complains that CellPro's infringement

has damaged its ability to service foreign markets, Hopkins must rely on foreign

patent protection.").  This has been the law for over 150 years:

> ***But these acts of Congress do not, and were not
> intended to, operate beyond the limits of the United
> States****; and as the patentee's right of property and
> exclusive use is derived from them, they cannot extend
> beyond the limits to which the law itself is confined.
> **And the use of it outside of the jurisdiction of the
> United States is not an infringement of his rights, and
> he has no claim to any compensation for the profit or
> advantage the party may derive from it***.

*Brown*, 60 U.S. at 195 (1856) (emphasis added).

The Supreme Court recently confirmed that *Brown's* holding applies today

to cases under 271(f).  *Microsoft*, 550 U.S. at 454-55 ("The presumption that

United States law governs domestically but does not rule the world applies with

particular force in patent law.").  *Microsoft* was a § 271(f) case that dealt with

conduct outside the United States, but the Supreme Court refused to impose

liability without express congressional language.  *Id.* at 442.

This Court has relied on *Brown* and *Microsoft* in multiple recent cases.

First, this Court relied on *Microsoft* to reverse *en banc* its prior holding that

method claims were actionable under 271(f).  *Cardiac Pacemakers, Inc. v. St. Jude*

51

*Medical, Inc.*, 576 F. 3d 1348, 1365 (Fed. Cir. 2009) (*en banc*) ("Any ambiguity as to Congress's intent in enacting Section 271(f) is further resolved by the presumption against extraterritoriality.  The Supreme Court took a narrow view of Section 271(f) by stating that the presumption against extraterritoriality still applies to Section 271(f), even though that section specifically extends the reach of U.S. patent law in a limited manner.").  In *Power Integrations*, the Court emphasized that "[r]egardless of how the argument is framed," a patentee may not claim damages based on "activity that occurred outside the territory of the United States."  *Power Integrations*, 711 F.3d at 1371.[16]  This is especially true for services, performing methods, even if cast as "use" of an apparatus that implements the claimed method.[17]

---

[16] Accordingly, even were to WG recast its damages theory as some sort of "convoyed sales," it would not change the result, as confirmed by *Power Integrations* and also *Rite-Hite*.  "Notwithstanding the broad language of § 284, judicial relief cannot redress every conceivable harm that can be traced to an alleged wrongdoing. . . . Thus, along with establishing that a particular injury suffered by a patentee is a 'but for' consequence of infringement, there may also be a background question whether the asserted injury is of the type for which the patentee may be compensated."  *Rite-Hite v. Kelley*, 56 F.3d 1538, 1546 (Fed. Cir. 1995).

[17] *Deepsouth* concerned "making" the invention, not its "use." 406 U.S. at 527 ("Laitram does not suggest that Deepsouth 'uses' the machines.").  In *Cardiac Pacemakers* this Court *en banc* reversed prior law allowing liability under 271(f) for method claims, and likewise "use" of an apparatus that is claimed for implementing the claimed method is too fine a line to draw between no liability and tens of millions of dollars of liability.  The Supreme Court in *LG v. Quanta*, 128 S. Ct. 2109, 2117-18 (2008) recognized that for patent exhaustion, another

WG has not been able to cite any persuasive authority for its proposition that its patent rights extend to wholly extraterritorial use. The primary case WG has relied upon for its faulty theory is an ***unpublished*** affirmance of a Northern District of Oklahoma case almost 25 years ago, long before this Court's precedential *Power Integrations* case and the Supreme Court's *Microsoft* case. *T.D. Williamson, Inc. v. Laymon*, 723 F. Supp. 587 (N.D. Okla. 1989), *aff'd*, 923 F.2d 871 (Fed. Cir. 1990) (unpublished). *Williamson* cannot be read, as WG has contended, as a generalized approval of lost profits for fully extraterritorial use of a patented invention based on 271(f). *Williamson* is confined to its facts – facts significantly different from *Microsoft*, *Power Integrations*, and this case.

---

type of statutory limit on enforcement of a patent, there was no meaningful distinction between practicing a method claim and using the apparatus claimed to implement the method.

Here, as in *LG*, use of an apparatus to practice a method is no different for defining the statutory limits of the patent right, and reinforces the fact no damages should flow from foreign use. WG itself repeatedly presented the apparatus and method claims as mirror images of each other. A010660-62, A002290-91, A002371-72. Moreover, claim 18 of the '520 patent was rejected as unpatentable over a method claim in the '017 patent; this rejection was overcome by filing a terminal disclaimer. A013485-86, A000502 at 11:20-25, A013498-99, A013500-01. Further, the competition between WG and ION's foreign customers was for ***providing a service, not selling an apparatus***. Given that the system/apparatus claims are the embodiment of the method claims, that WG's lost profits are based on competing sales of services, and the statutory limitations on the territorial limit on all U.S. patent rights, here permitting lost profits on services is no different than permitting them on practicing the method claims – clearly impermissible under this Court's *en banc* decision in *Cardiac Pacemakers*.

In *Williamson*, the defendants directly competed with the patentee both inside and outside the United States for jobs performed using infringing caliper "pigs." The defendants' business model involved maintaining and storing components of the infringing pigs in the United States. *Id.* at 607. After winning a bid for a foreign survey job, the defendants would ship the components to the foreign jobsite ***for their own use***. *Id.* Furthermore, when the foreign job was complete, the defendants would ship the disassembled components back to the United States until needed for a subsequent job. *Id.*

These facts were critical to the district court's finding of liability for lost profits for extraterritorial activities, as demonstrated by its equal treatment of the same activities before and after enactment of § 271(f) (as the case spanned the time period before and after enactment). Prior to enactment, liability for extraterritorial activities was controlled by *Deepsouth*, yet the *Williamson* court still found the defendants liable for overseas jobs performed during that period using components shipped unassembled from the United States – facts that on their face mirrored those allowed under *Deepsouth*. The court explained why *Deepsouth* did not apply: "In *Deepsouth*, the infringing units remained unassembled for shipment to foreign purchasers, who assembled and used the infringing device overseas. ***The Deepsouth defendant apparently had no further involvement with an infringing unit, once it was shipped to the foreign purchaser***." *Id.* at 607 (emphasis added).

In short, the unique facts surrounding the *Williamson* defendants' business model –
shipping components overseas to themselves for their own competitive use – led to
a finding of liability for lost profits even under *Deepsouth*, the so-called "loophole"
that 271(f) closed.

Here the facts are diametrically opposed to *Williamson*.  ION shipped
DigiFINs and Lateral Controller software to customers overseas, who then
assembled ION's components with many other parts (vessel, streamer systems,
computers, etc.).  A002371, A002477-78.  But unlike the *Williamson* defendants,
ION's customers, not ION, engaged in subsequent use of the combination in
competition for services with WG.  Unlike the *Williamson* defendants, ION
released both legal title and physical possession of the components to third parties
overseas.  A002357-59.

To the extent *Williamson* conflicts with this Court's or the Supreme Court's
precedential authority, *Williamson* cannot be considered good law.  The current
controlling law states "'[f]oreign conduct is [generally] the domain of foreign law,'
and in [patent law] in particular, foreign law 'may embody different policy
judgments about the relative rights of inventors, competitors, and the public in
patented inventions.'"  *Microsoft v. AT&T*, 550 U.S. at 455 (quoting the Solicitor
General's amicus brief).  And as this Court has previously acknowledged: "The
Court [in AT&T] sent a clear message that the territorial limits of patents should

not be lightly breached." *Cardiac Pacemakers*, 576 F.3d at 1362 (citation omitted). Those limits should not be breached here.

### C.    *Panduit* Cannot be Satisfied Because ION and WG do not Compete in the Marketplace, Here or Abroad

Even if lost profits on extraterritorial uses were proper, WG failed to satisfy *Panduit* in any event. The jury instructions explicitly required direct competition in the same market: "The burden is on WesternGeco to show that its product competed *in the same market with ION's product* and that it would have made the alleged lost sales if the infringement had not occurred." A006139 (emphasis added); *see also* A011011.

Under that instruction, neither the court nor any reasonable jury could have found lost profits, because it is undisputed that ION and WG do not compete in the same market. ION supplies components in the United States (which WG does not), and WG sells services overseas (which ION does not). The only direct competition is by third parties (ION's customers) for non-infringing activity (performance of marine seismic surveys outside the U.S.). ION's indirect competition is insufficient, as a matter of law, to give rise to lost profits under the jury instruction as explicitly stated. A006139, A011011. ION raised this argument at *Daubert*, during jury instructions, and on JMOL. A010153-54, A011007, A011056-59, A011480-82.

WG realized this deficiency, and in fact proposed changing the above quoted language from "same market with ION's product" to "same market with the surveys using ION's product" to account for this distinction.  A011113.  But even though the court refused WG's modification (to which WG did not object, see A006024-27)[18], the jury nevertheless found lost profits despite the clear lack of competition in any market.

The district court wrongly held that *Panduit* "applied" since ION acted as if it applied, and the jury instructions noted *Panduit* applied.  A000033.  This is akin to stating that a defendant infringes because it agrees a § 271(a) instruction was properly given.  ION's argument was that the *Panduit* test was not ***satisfied***.  While it is undisputed that *Panduit* "applied," that analysis is separate from enquiring as to whether the necessary facts are proven.  *Wechsler*, 486 F.3d at 1293 ("Only after the court has decided, as a matter of law, that lost profits are available does the jury then get to determine the amount of those lost profits.").  No reasonable jury could

---

[18] The court's instruction was consistent with authority requiring competing products in the same market segment.  *BIC Leisure Prods., Inc. v. Windsurfing Int'l, Inc.*, 1 F.3d 1214, 1218 (Fed. Cir. 1993); *see also Mitutoyo Corp. v. Cent. Purchasing, LLC*, No. 03 C 0990, 2006 WL 644482, at *5 (N.D. Ill. Mar. 9, 2006*), aff'd in relevant part, rev'd in part*, 499 F.3d 1284 (Fed. Cir. 2007); *Crystal Semiconductor Corp. v. TriTech Microelectronics Intern., Inc.*, 246 F.3d 1336, 1360 (Fed. Cir. 2001).  If the patentee's and the infringer's products are not substitutes, "*Panduit's* first two factors do not meet the 'but for' test."  *BIC*, 1 F.3d at 1218 (stating that the analysis of the first factor "assumes that the patent owner and the infringer *sell substantially the same product*") (emphasis added).

have found *Panduit* was satisfied, since the parties were not competing in the marketplace.  A011056-59.

Like the unambiguous assignments to STC, like the clear authority on 271(f)(1) mental state, and like the unequivocal *Power Integrations* holding, the district court ignored this critical issue (A000033-34), and in doing so erred by holding lost profits were available.  The lost profits award must be vacated as a matter of law, as there is insufficient evidence to support competition in any relevant market.  *Mitutoyo*, 499 F.3d at 1291 ("We hold that the trial court correctly determined that Mitutoyo failed to meet its burden of establishing any market overlap, so as to entitle it to a jury trial on lost profit damages.")

## CONCLUSION

The Bittleston patents, and any remedy based on the Bittleston patents, should be dismissed for lack of subject matter jurisdiction, the liability determinations should be vacated and remanded for a new trial, and the lost profits award should be vacated.

September 5, 2014                    Respectfully submitted,

/s/ David J. Healey
DAVID J. HEALEY
BRIAN G. STRAND
BAILEY HARRIS
FISH & RICHARDSON P.C.
One Houston Center
1221 McKinney Street, Suite 2800
Houston, TX 77010
(713) 654-5300

JUSTIN M. BARNES
FRANCIS J. ALBERT
OLGA MAY
FISH & RICHARDSON P.C.
12390 El Camino Real
San Diego, CA 92130
(858) 678-5070

FRANK P. PORCELLI
FISH & RICHARDSON P.C.
One Marina Park Drive
Boston, MA 02210-1878
(617) 542-5070

Counsel for Defendant-Appellant
ION GEOPHYSICAL
CORPORATION

## <u>CERTIFICATE OF COMPLIANCE</u>

1.    This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 13537 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b).

2.    This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Office 2007 in Times New Roman 14pt.

Dated:  September 5, 2014

/s/ David J. Healey
DAVID J. HEALEY
FISH & RICHARDSON P.C.
One Houston Center
1221 McKinney Street, Suite 2800
Houston, TX 77010
(713) 654-5300

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify on this 5th day of September, 2014, I electronically filed the foregoing with the Clerk of the Court of the United States Court of Appeals for the Federal Circuit by using the CM/ECF system.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ David J. Healey
DAVID J. HEALEY
FISH & RICHARDSON P.C.
One Houston Center
1221 McKinney Street, Suite 2800
Houston, TX 77010
(713) 654-5300

61